**CF & I STEEL CORPORATION,
Plaintiff-Appellant,**

v.

**The COLORADO AIR POLLUTION CONTROL COMMISSION, the Division of Administration, Colorado Department of Health; the Air Pollution Control Division of the Division of Administration, Colorado Department of Health, Defendants-Appellees.**

**No. 77–804.**

Colorado Court of Appeals,
Div. I.

July 23, 1981.

Rehearing Denied Aug. 13, 1981.

Certiorari Granted Jan. 18, 1982.

Welborn, Dufford, Cook & Brown, David W. Furgason, William C. Robb, John D. Faught, Denver, for plaintiff-appellant.

J. D. MacFarlane, Atty. Gen., David W. Robbins, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen., Gregory J. Hobbs, Jr., First Asst. Atty. Gen., Janet L. Miller, Asst. Atty. Gen., Denver, for defendants-appellees.

SMITH, Judge.

CF & I Steel Corporation (CF & I) brought suit pursuant to the Administrative Procedure Act, § 24–4–101 et seq., C.R.S. 1973, and the Colorado Air Pollution Control Act of 1970, § 25–7–101 et seq., C.R.S. 1973, to determine the validity of Section II.D. Air Pollution Control Commission Regulation No. 1, promulgated by the Colorado Air Pollution Control Commission (Commission). The trial court upheld § II.D. of the regulation and entered judgment in favor of the Commission. On appeal, this court reversed the judgment of the trial court and ordered that the suit be dismissed because CF & I lacked standing to bring the action. *CF & I Steel Corp. v.*

*Colorado Air Pollution Control Commission,* Colo.App., 606 P.2d 1306 (1980). On certiorari, the Colorado Supreme Court reversed this court's decision relative to the issue of standing and remanded the cause for determination on the merits of the issues raised in the first appeal. *CF & I Steel Corp. v. Colorado Air Pollution Control Commission,* Colo., 610 P.2d 85 (1980).

Section II.D. was promulgated by the Colorado Air Pollution Control Commission purportedly pursuant to its authority under the Air Pollution Control Act for the purpose of controlling "fugitive dust" emissions. "Fugitive dust" is defined in regulation No. 1 as:

"Solid airborn particulate matter emitted from any source other than an opening which channels the flow of air contaminates and then exhausts the contaminates directly into the atmosphere. Fugitive dust also includes solid particles released into the atmosphere by natural forces or by mechanical processes, such as crushing, grinding, milling, drilling, demolishing, shoveling, conveying, covering, bagging, sweeping, etc."

Section II.D.2. specifies opacity requirements for fugitive dust emission emanating from unenclosed operations:

"a. No person shall emit or cause to be emitted from any source of fugitive dust whatsoever, any particulate matter which,

(i) at or from the source of said emission, is of such a shade or density on the property of emission origination so as to obscure an observer's vision to a degree in excess of 20% opacity, or

(ii) is visibly transported off the property of emission origination and remains visible to an observer positioned off said property when sighting along a line which does not cross the property of emission origination."

Exceptions from the opacity regulation are provided for in § II.D.2.b.:

"(i) All unpaved roads and unpaved parking lots . . . .

(ii) Earth and construction-material moving and excavating activities except for

crushing, grinding, milling, conveying, and bagging processes . . . .

(iii) Demolition, wrecking, and moving of structures and explosives detonation activities . . . .

(iv) Open mining activities . . . .

(v) Agricultural cultivation activities . . . .

(vi) Sources of fugitive dust which exceed opacity regulations for a period or periods aggregating less than three (3) minutes in any sixty (60) consecutive minutes.

(vii) Sources of fugitive dust from which dust emissions exceed opacity regulations when wind velocities exceed 30 m.p.h. as determined by one or more of the following practices as approved by the Division: By a one-hour average at the nearest official station of the U.S. Weather Service; by interpretation of surface weather maps by a qualified meteorologist; or by use of one or more anemometers at the site.

(viii) Any other sources as specified by the Commission."

On appeal, CF & I challenges the validity of § II.D. on a number of grounds including that it violates CF & I's Fourteenth Amendment due process and equal protection rights. We agree that the regulation as presently constituted is invalid in that it violates the appellant's Fourteenth Amendment rights, and, therefore, we only consider CF & I's arguments respecting due process and equal protection.

## I. Due Process

CF & I contends that the fugitive dust regulation contravenes its Fourteenth Amendment due process rights in that the regulation is vague, ambiguous, and overbroad. CF & I argues that it is impossible to tell from the above quoted language whether to be actionable an emission is an active or a passive process, *i.e.,* whether a landowner may be in violation of the regulation simply by virtue of the action of wind on his property, or whether he only "emits" fugitive dust as the result of some active intervention on his part with land-bound

particulate matter. CF & I further argues that since the regulations prescribe sanctions for emissions of *any kind* that visibly move off the property of their origination, the regulation is overbroad. It is our view that the regulation is invalid in that, in its totality, it is so vague that a potential offender cannot determine what he may or may not do to avoid being in violation of the regulation.

The due process clause requires that a regulation not be "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Watson v. Board of Regents*, 182 Colo. 307, 512 P.2d 1162 (1973).

From the language of the opacity requirement, it is difficult, if not impossible, to determine what constitutes an unlawful or prohibited emission of fugitive dust. Section II.D. does not differentiate between emissions which result from the action of natural forces as opposed to those resulting from some human activity conducted on the land. One cannot determine whether a landowner, lessee, or trespasser, may be held in violation of the regulation if he is simply in possession of the subject property, or whether it is necessary that he actively stir up dust.

Nor does the definition of "emission" provided in the Air Pollution Control Act aid in the resolution of this question. Under that definition, emission means "the discharge or release into the atmosphere of one or more air contaminates." Section 25–7–103(7), C.R.S.1973. The use of the words "discharge or release" would seem to imply a conscious human decision in order for there to be an emission, yet § II.D. encompasses a much broader spectrum of precipitating causes.

The extremely broad scope of the regulation poses a complex dilemma for the typical landowner. Very simple and routine activities may result in violations, depending upon the interaction or combination of a number of complex and perhaps unrelated factors. This dilemma is perhaps best illustrated by example. A person who spades up a portion of his yard and rakes it to make it smooth and level, and in so doing "discharges or releases" dust into the air, becomes subject to the regulation. Yet if his purpose is to plant a garden, § II.D. 2.b.(v), or if his work can be considered as earth moving or excavation, § II.D.2.b.(ii), then he need not be concerned with the "opacity" requirements. On the other hand, if his purpose is to install a patio, driveway, or tennis court, the dust he creates may not be, in density, sufficient to impair his neighbor's view by more than 20%, of the ground where he is working, § II.D.2.a.(i). Nor, regardless of its percentage of opacity, may it visibly drift outside his property line, § II.D.2.a.(ii), unless he works for only three minutes out of any consecutive sixty minute period, § II.D. 2.b.(vi), or unless the wind is blowing more than thirty miles per hour, as determined by the nearest United States Weather Station, a meteorologist's interpretation of weather maps, or by an anemometer installed on his site. Section II.D.2.b.(vii). It should be noted in passing, that the first two wind measurement methods are "after the fact" and provide no guidance to anyone whose projected operations may violate the regulation.

This rather simple example only touches upon the complexities and does not even pose the interpretational problems that result from multipurpose operations or those which do not easily fit the extremely broad definitions of the exempted purposes, *e.g.*, "agricultural cultivation activities." Section II.D.2.b.(v).

It is, however, evident that the opacity regulation as presently constituted is so complex and vague as to its possible interpretations that not only is it incapable of enforcement, but it is incapable of comprehension by men of ordinary intelligence. The combination of overbreadth, complexity, and vagueness here operates to subject all Coloradans to the risk of criminal prosecution without giving them adequate notice of what actions on their part may be held to be violations of the law. In doing so, the

opacity regulation contravenes fundamental due process rights. *See Watson v. Board of Regents, supra.*

## II. Equal Protection

Section II.D.2.b. exempts certain fugitive dust sources including, *inter alia*, unpaved roads and unpaved parking areas, from the opacity and visibility standards provided in § II.D.2.a. However, unpaved roads and unpaved parking areas are subject to the provisions of § II.D.3., which section sets up three different classifications for these sources and accords different standards and requirements for each. The subject classes are: (1) new unpaved roads and unpaved parking areas; (2) existing privately owned or maintained unpaved roads and unpaved parking areas; and (3) existing publicly owned or maintained unpaved roads and unpaved parking areas.

The primary problem here is in the distinction between existing privately owned and publicly owned unpaved roads and unpaved parking areas. The regulation provides in general terms that any private person owning an existing unpaved road or unpaved parking area which exceeds a specified traffic count must discontinue and prevent use of that road or parking area unless the Commission has approved fugitive dust control plans. Existing publicly held unpaved roads and unpaved parking areas can, however, be used without a fugitive dust control plan, irrespective of traffic volume, so long as an annual report is filed with the Commission. CF & I contends that the different treatment applied to private and public unpaved roads and unpaved parking areas denies to it and to other private entities maintaining unpaved roads or parking lots equal protection of the law in violation of the Fourteenth Amendment.

■ Where the equal protection clause is concerned, the test of constitutionality is whether the regulation is rationally related to a legitimate governmental purpose, and whether there is a rational basis to uphold the classifications or distinctions created by the regulation. *City of Leadville v. Rood*, 198 Colo. 328, 600 P.2d 62 (1979); *Turner v. Lyon*, 189 Colo. 234, 539 P.2d 1241 (1975); *People v. Taylor*, 189 Colo. 202, 540 P.2d 320 (1975).

Under § II.D.3., existing privately owned or maintained, and existing publicly owned or maintained, unpaved roads and unpaved parking areas are held to different standards with regard to the prevention of fugitive dust emission. Section II.D.3.b.b–1, pertaining to "Existing Privately Owned or Maintained Unpaved Roads and Unpaved Parking Areas" provides as follows:

"Any person owning any unpaved road or unpaved parking area or having a right-of-way easement or possessory right to use the same, found by the Division to exceed a maximum allowable traffic count of 165 vehicles per day averaged over any consecutive 3-day period, shall discontinue and prevent use of that road or parking area, unless the Division has approved a fugitive dust control plan which includes preventive measures as outlined in § II.D.9,[1] and unless the conditions of the approved plan are met continually."

Section II.D.3.c. pertaining to "Existing Publicly Owned or Maintained Unpaved Roads and Unpaved Parking Areas" provides:

c–1 "By July 1 of each year the Division shall submit to the political subdivision owning or maintaining unpaved roads or unpaved parking areas, and to the Commission, a report on the nature and degree of emissions from existing unpaved roads and parking areas within said political subdivisions which exceed 165 vehicles per day averaged over any 3-day period based upon traffic count

---

1. Section II.D.9.a.—"Unpaved Roads and Unpaved Parking Areas" provides as follows:

a–1 "Abatement and preventive measures shall be approved by the Division and may include but shall not be limited to frequent watering, addition of dust palliatives, detour-ing, paving, closure, speed control, or other means such as surface treatment with penetration chemicals (ligninsulfonates, oil, water, cutbacks, etc.) or methods of equal or greater effectiveness in reducing the air contamination produced."

information as collected by the Division or the political subdivision.

c–2 Said political subdivisions shall submit a plan and progress report to the Division by October 1 of each year which includes a specified time schedule for the control of fugitive dust emissions on unpaved roads and unpaved parking areas as reported by the Division pursuant to Section II.D.3 (c–1). Said plans shall be based upon:

(i) availability of existing and new funds for paving or fugitive dust suppression;

(ii) use of preventive measures applicable to unpaved roads and unpaved parking areas as outlined in Section II.D.9."

■ Hence, it is clear that the dust control requirements are much more stringent for private than for public unpaved roads and unpaved parking areas. The Commission argues that such disparate treatment is justified because private entities are better able to afford the preventive measures than are public entities. This reasoning, even if it is true, does not justify the classification which results in disparate treatment. The causes of, and the problems associated with, the control and abatement of fugitive dust are the same for private as well as for public roads and parking lots. The public-private distinction, based on who can better afford to solve the problem, is not rationally related to the legitimate goal of reducing fugitive dust, and therefore, the classification is unreasonable and discriminatory. Thus, we hold that § II.D.3. is unconstitutional in that it violates the appellant's equal protection rights.

### III.

CF & I alleges numerous other errors with respect to the adoption and substance of the fugitive dust opacity regulations. Although it is unnecessary to reach the procedural issues here, a significant number of the problems associated with the regulation are attributable to the fact that the opacity tests set forth for the regulation of fugitive dust were originally developed as enforcement tools for determining concentrations of particulates emitted from stack or point sources.

Relative to point source emission, the opacity standards and tests have a measure of validity in that the emissions are ejected from a confined opening. The amount and nature of the particulates emitted are neither inherent to the land nor do the emissions result from the action of the forces of nature. They are subject to the absolute control of the operator of the emission source. A density or opacity measurement can thus be taken from the base of the plume which arises from such opening. On the other hand, fugitive dust, by definition, does not emanate from a fixed location or an area of constant dimension, that is to say, a point source. It is a landbound particulate matter that for some reason, or combination of reasons, over some undefined area, becomes airborne. Thus, the methods by which measurements can be taken are entirely different.

We might ask, for example, at what vertical height from the ground is the dust to be analyzed and at what distance from what point of origin should opacity be measured. This inherent problem of determining at what location opacity of dust generated by moving vehicles should be measured was recognized by the Commission is its disinclination to incorporate any opacity tests into the regulations for unpaved roads and unpaved parking areas. While we agree with the Commission that opacity standards are not appropriate for unpaved roads and unpaved parking areas, we find it difficult to understand how opacity as a standard to determine whether the law has been violated is any more appropriate to particulates lofted into the air by the operation of tractors, earth movers, or graders, or to those taking flight because of the action of the wind alone, not to mention those resulting from the interaction of both types of propelling mechanisms.

■ In conclusion, regulations adopted to accomplish regulation of fugitive dust emission must be sufficiently definitive and specific that everyone involved will be able to

determine what it is that he may or may not do. In addition, such regulations must be uniformly applicable to all persons creating the same type of emission while engaged in the same function for the same purpose. Since the constitutional infirmities we have found in the regulation are basic to all of § II.D., we conclude that it's parts are not severable and that the entire § II.D. of regulation No. 1 must fall.

Judgment reversed.

BERMAN and VAN CISE, JJ., concur.